KEITH WYATT, PETITIONER-RESPONDENT, v. METRO-POLITAN MAINTENANCE COMPANY, RESPONDENT-APPELLANT.

Argued April 4, 1977—Decided July 25, 1977.

Mr. *Raymond L. Cunneen* argued the cause for appellant (*Messrs. Cunneen and O'Gorman,* attorneys; *Mr. Hugh J. O'Gorman* on the brief).

Mr. *Philip Bolstein* argued the cause for respondent (*Mr. Samuel S. Bassin,* attorney).

The opinion of the court was delivered by

PASHMAN, J. On the afternoon of August 7, 1972, petitioner, Keith Wyatt, was robbed and shot during his lunch break as he was returning to the Martland Medical Center in Newark. He was employed there as a porter by defendant Metropolitan Maintenance Co. The judge of compensation and the Appellate Division upheld his claim for benefits under the Workers' Compensation Act, *N. J. S. A.* 34: 15-1 *et seq.,*[1] relying on *Hornyak v. The Great Atlantic & Pacific Tea Co.,* 63 *N. J.* 99 (1973). In its petition for certification, defendant suggested that this case was factually distinguishable from *Hornyak* because petitioner had access

---

[1] *L.* 1975, *c.* 352, amending *N. J. S. A.* 34:1A-5.1, renamed the Division of Workmen's Compensation as the "Division of Workers' Compensation," effective March 3, 1976. Although the statutory change was limited to the term "Division of Workmen's compensation," we shall refer to the benefits administered by the division as "workers' compensation benefits."

at his place of employment to eating facilities where hot food was served. It argued that the lower courts erred in extending *Hornyak* and in refusing to bar compensation under the going and coming rule. Having granted certification, 71 *N. J.* 336 (1976), we now hold that *Hornyak* is controlling and therefore affirm.

Petitioner was 17 years old when this incident occurred. Although he worked part-time at the hospital when school was in session, during the summer he was employed full-time, working the 7 A.M. to 3:30 P.M. shift. He ordinarily was allotted 30 minutes to eat his lunch at any time between 12 noon and 1 P.M. A cafeteria in the hospital which was open to defendant's employees and hospital staff served hot meals, but petitioner ate there infrequently because he found the food unsatisfactory. Instead, he brought his own lunch or bought a sandwich at a nearby store where the food was cheaper. He was under no instructions from his supervisors to eat in the hospital cafeteria or to remain on the premises during his half hour break.

On the day of the assault, he left shortly after noon to purchase a soda and sandwich at a luncheonette which was located about two blocks from the hospital. The walk took about five minutes. He bought his lunch to "take out," intending to eat it back at the hospital. He was accosted on the street just after he left the store. His assailant drew a gun and dragged him into an alley, where he took petitioner's pocket change and then, without warning, shot him in the stomach. Subsequently he underwent surgery, but the doctors were unable to remove the bullet. Although the youth returned to work several weeks later and began school as scheduled, he was unable to participate in recreational sports. The judge of compensation awarded compensation for the period of temporary disability and found 12½% partial permanent disability. The Appellate Division affirmed in an unpublished *per curiam* opinion.

The sole issue on appeal is whether the finding of compensability, which was predicated on our decision in *Horn-*

*yak,* was correct. As both the compensation judge and the Appellate Division recognized, the facts in that case differ slightly from those present here. In *Hornyak* the employee worked a night shift from 9:30 P.M. to 6 or 7 A.M. and took his half hour lunch break between 1:30 A.M. and 2 A.M. Although he was required to check in when beginning work and to check out when finishing his shift, he was permitted to leave the premises to eat without checking out. 63 *N. J.* at 100. The employee lunchroom had vending machines from which drinks could be obtained, but no meals were served. Hence, most of the employees were in the habit of driving to eating places in neighboring towns. *Id.* The compensation claimant was injured in an automobile accident just a few blocks from the employer's warehouse as he was returning from his meal at a nearby diner. *Id.*

Writing for the Court, Justice Jacobs rejected the argument that the employee's mealtime departure from the premises was an abandonment of employment. Stressing the remedial purposes of the act and the questionable underpinnings of the going and coming rule, see *Watson v. Nassau Inn,* 74 *N. J.* 155, 161 (1977), he analogized the half hour lunch break to other brief interruptions in work which were held to be "in the course of" employment. *See, e. g., Jones v. Continental Electric Co., Inc.,* 75 *N. J. Super.* 76 (App. Div.), certif. den. 38 *N. J.* 312 (1962) (night watchman's midnight lunch); *Crotty v. Driver Harris Co.,* 49 *N. J. Super.* 60 (App. Div. 1958), certif. den. 27 *N. J.* 75 (1958) (smoke or breath of fresh air); *Jordan v. Western Electric Co.,* 1 *Or. App.* 441, 463 *P.* 2d 598 (1970) (coffee break); *Dependents of Pacheco v. Orchids of Hawaii,* 54 *Haw.* 166, 502 *P.* 2d 1399 (1972) (cashing pay check). As he pointed out, the employee had to eat

. . . and, while hot food was a matter of his own choice, obtaining it not only convenienced him but was also geared towards increasing his efficiency which was clearly in his employer's interest.

[63 *N. J.* at 107–08]

Defendant erroneously argues that the availability of hot meals at the hospital and the act of punching out for the lunch break in this case render *Hornyak* inapposite. This argument overlooks the fact that our decision there was grounded on the more significant fact that an employee who interrupts his work and leaves his place of employment for lunch knows that he has not completed his workday and that he will be returning as soon as his lunch is over. His time is really not his own. 63 *N. J.* at 107–08. Midday meal periods have long been recognized as an integral part of the work routine. Very early in the history of the act, our courts held that accidental injuries during such breaks would be compensable if the employee was at or near his usual place of work. *See Flanagan v. Charles E. Green & Son,* 121 *N. J. L.* 327 (Sup. Ct. 1938), aff'd, 122 *N. J. L.* 424 (E. & A. 1939) ; *Bolos v. Trenton Fire Clay & Porcelain Co.,* 102 *N. J. L.* 470 (Sup. Ct. 1926), aff'd 103 *N. J. L.* 483 (E. & A. 1927). Although we denied compensation in *Robertson v. Express Container Corp.,* 13 *N. J.* 342 (1953), because the employee strayed to an unfamiliar part of the employer's premises during her lunch break, we subsequently took a much more liberal view in *Tocci v. Tessler & Weiss, Inc.,* 28 *N. J.* 582 (1959), awarding compensation to an employee injured while participating in a softball game regularly held on the employer's premises.

Thus, Hornyak's rationale is fully applicable as long as the mealtime departure from the work premises is a practice permitted or countenanced by the employer and the employee's activity cannot be considered an abandonment of, or deviation from, the employment. In this instance, petitioner's injuries from the assault[2] occurred within two blocks of the medical center just after he purchased his

---

[2]Defendant has not argued that the assault lacks a causal relation to petitioner's employment. *See White v. Atlantic City Press,* 64 *N. J.* 128 (1973) ; *Martin v. J. Lichtman & Sons,* 42 *N. J.* 81 (1964) ; *Howard v. Harwood's Restaurant Co.,* 25 *N. J.* 72 (1957).

lunch and began his return trip to the medical center. Under these circumstances, it would have been clearly erroneous to deny compensation.

However, defendant urges us to re-assess the wisdom of *Hornyak* itself, quoting extensively from Dean Larson's criticism of the decision and parade of "horrible hypotheticals"[3] in his treatise, *The Law of Workmen's Compensation* (1976 Supp.), § 15.53. To the extent that this critique is premised on a defense of the "going and coming" rule, we are not persuaded. Assuming the vitality of the rule, see *Watson v. Nassau Inn, supra,* 74 *N. J.* at 161, we continue to think that an employee's luncheon break is sufficiently conditioned by time constraints and work obligations to set it apart from his trip home at the end of the day. See *Hornyak v. The Great Atlantic & Pacific Tea Co.,* 63 *N. J.* at 108. In addition, these relatively brief respites usually redound to the employer's benefit by enabling the employee to renew his work with increased vigor. This being the case, we find no compelling reason to depart from the basic rationale of *Hornyak.*

Affirmed.

SCHREIBER, J., dissenting. The petitioner employee, who chose to eat lunch at a luncheonette about two blocks away from the hospital where he was working, was shot and robbed. The Judge of Compensation, the Appellate Division and the majority of this Court, each relying on *Hornyak v. The Great Atlantic and Pacific Tea Co.,* 63 *N. J.* 99 (1973), have held

---

[3]This criticism was evidently inspired by the suggestion that off-premises injuries during lunchtime breaks may be compensable even if the employee utilizes his free time to perform other errands of a personal nature. *See* 63 *N. J.* at 106, citing *Dependents of Pacheco v. Orchids of Hawaii, supra,* 502 *P.* 2d at 1401. We need not consider under what circumstances such activity will be deemed an abandonment of or deviation from the employment since there is not even a hint of any such deviation in this case. *Cf. Rainear v. C. J. Rainear Co., Inc.,* 63 *N. J.* 276 (1973).

the petitioner's injuries are compensable under the Workers' Compensation Act, *N. J. S. A.* 34:15-1 *et seq.*

The language prescribing compensability criteria expressed in the Workers' Compensation Act when first enacted in 1911 remains the same today. *Compare L.* 1911, *c.* 95, § 7 *with N. J. S. A.* 34:15-7. Compensation is payable for personal injuries "by accident arising out of and in the course of" employment. Interpretation of the phrases "arising out of and in the course of" employment was first enunciated in *Bryant, Adm'x v. Fissell,* 84 *N. J. L.* 72 (Sup. Ct. 1913). This Court has continued through the years to acknowledge the *Bryant* pronouncement. *See Hornyak v. The Great Atlantic & Pacific Tea Co.,* 63 *N. J.* 99, 101 and 108 (1973); *Bergman v. Parnes Brothers, Inc.,* 58 *N. J.* 559, 563 (1971); *Hammond v. The Great Atlantic & Pacific Tea Co.,* 56 *N. J.* 7, 11 (1970).

In *Bryant* the court wrote that "[f]or an accident to arise out of and in the course of employment, it must result from a risk reasonably incidental to the employment." 84 *N. J. L.* at 76. The court further elucidated that an accident arises in the course of employment "if it occurs while the employe is doing what a man so employed may reasonably do within a time during which he is employed, and at a place where he may reasonably be during that time." *Id.* at 77. And so the question becomes: Did the accident occur at such a time and place that the employee's activity may be considered to be so reasonably incidental and related to the employment that the accident should be compensable? Put another way, is the cost of that accident reasonably includable in the price to be charged for the employer's product or service? *Ricciardi v. Damar Products Co.,* 45 *N. J.* 54, 60 (1965). Justice Proctor reminded us of this consideration in *Hammond v. The Great Atlantic & Pacific Tea Co., supra:*

Workmen's compensation legislation is designed to place the cost of accidental injuries which are work-related upon the employer who can make these funds available out of his operating expenses, and

this legislative goal must always be kept in mind when considering factual patterns presented. [56 *N. J.* at 14]

The economic reality is that consumers will probably be called upon to pay in whole or in part for the employer's operating expenses. In *Morris v. Hermann Forwarding Co.,* 18 *N. J.* 195, 197–198 (1955), this Court quoted approvingly from *Glasser v. Youth Shop,* 54 *So.* 2d 686, 687 (Fla. 1951), that the purpose of a workers' compensation act is

'to shoulder on industry the expense incident to the hazards of industry; to lift from the public the burden to support those incapacitated by industry and to ultimately pass on to the consumers of the products of industry such expense.' Since industry must carry the burden, there must then be some causal connection between the employment and the injury, or it must have had its origin in some risk incident to or connected with the employment, or have followed from it as a natural consequence.

Thus we should ask whether the cost of a particular accident is one that should be imposed upon the consuming public as an appropriate production expense. To resolve the problem, attention should be directed to determine and consider, *inter alia,* whether the accident occurred outside regular work hours, and, if so, whether that was due to the employer's demand or request; whether the accident happened on the employer's premises, and, if not, whether the employer had directed that that activity be held elsewhere; and what relationship, if any, the event had with the employment.

The courts have frequently adverted to the beneficent purpose of the Workers' Compensation Act to support judicial interpretations which have imposed the cost of employee injuries on institutions which presumably will pass those expenditures on to consumers. Another equally important consideration, however, is that the costs of workers' compensation insurance have become a substantial factor in some enterprises to such an extent that some have departed from this state and others have been deterred from establishing plants here. The Report of the Governor's Economic Recovery

Commission, noting the high cost of workers' compensation insurance,[1] has recommended that the Legislature consider the cost factor when revising the act "with the objective of becoming competitive with other states." 1 *Governor's Economic Recovery Commission Report* 43 (1976). See Kalter, *New Jersey's Business Climate,* Sunday Star-Ledger, June 26, 1977, at 1, col. 1, in which it was reported that New Jersey's competitive position for industry has deteriorated substantially in relation to other states due in part to a "costly workers' compensation program." *Accord,* The Fantus Company, *A Research Program to Strengthen New Jersey's Competitive Position for Business and Industry* 36–38 (1976). Robert R. Heckman, Chairman of the Compensation Rating and Inspection Bureau of New Jersey, reported that insurance company underwriting losses for workers' compensation coverages in New Jersey increased from $20 million in 1975 to $52 million in 1976. One cause of that increase is the ever broadening scope of workers' compensation benefits applied by the courts in marginal cases. Star-Ledger, July 1, 1977, at 30, col. 1. So-called beneficent purposes of the act may not in fact be in the best interests of employees, particularly if costs of production become such that the work force must be reduced.

Turning to the facts of this case, it is indisputable that the shooting happened some two city blocks away from the employee's work area, at a place not under the employer's control. The employee, having punched out at the job site before leaving, was not engaged in his work at the time of the incident. He was not acting under the direction or supervision of his employer. He voluntarily decided to eat at a luncheonette in no way related to his employment. To contend that the employment relationship was established because the employee's nourishment benefitted the employer is a thin

---

[1]New Jersey ranks third highest in the nation in cost of Workers' Compensation Insurance. 2 *Governor's Economic Recovery Commission Report* app., at C–52, D–65 (1976).

thread indeed — for almost anything, including a good night's sleep or a warm bath, would have that effect.

The ultimate issue, as Justice Jacobs, relying upon *Bryant, Adm'x v. Fissell,* stated in *Hornyak,* is whether the employer's enterprise should absorb the costs with respect to such injuries. 63 *N. J.* at 102. Is the shooting of the petitioner at a luncheonette, during the lunch break, some distance away from the place of employment, so intimately related to his employment as a porter at a hospital that these expenses should be borne by the Martland Medical Center and its patients? In my opinion those injuries do not have a sufficient work connection to be deemed to be employment related. *See Strzelecki v. Johns-Manville,* 65 *N. J.* 314, 321 (1974) (dissenting opinion).

It may be contended that logically following *Hornyak* leads to compensability in this case. That may be so, although some factual differences exist. Functionally and logically *Hornyak,* although paying lip service to the going and coming rule, has obliterated it. I cannot agree with its holding.[2]

I would reverse.

Justice CLIFFORD joins in this opinion.

*For affirmance*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN and HANDLER—5.

*For reversal*—Justices CLIFFORD and SCHREIBER—2.

---

[2] For a vigorous criticism of *Hornyak, see* 1 Larson, *The Law of Workmen's Compensation* § 15.53 (Supp. 1977).