MIGUEL PEREZ, PETITIONER-RESPONDENT, v. PANTASOTE, INC., RESPONDENT-APPELLANT.

Argued November 9, 1983—Decided January 17, 1984.

*George J. Kenny* argued the cause for appellant (*Connell, Foley & Geiser*, attorneys; *Kathleen S. Murphy*, on the brief).

*Robert S. Sirota* argued the cause for respondent (*Goldstein, Ballen, O'Rourke & Wildstein*, attorneys).

The opinion of the Court was delivered by

SCHREIBER, J.

This case presents for our review the interpretation of the newly adopted provision of the Workers' Compensation Act, defining for the first time what constitutes "[d]isability permanent in quality and partial in character." *N.J.S.A.* 34:15–36

(West Supp.1983–84). The pertinent issues arose in a workers' compensation proceeding instituted by the petitioner, Miguel Perez, to obtain compensation for permanent partial disability due to an accident arising out of and in the course of his employment with the respondent Pantasote, Inc.

I

The accident occurred on January 23, 1980 when the petitioner, a material handler, was working for the respondent, his employer. While he was moving a drum down a ramp, his right foot slipped and he twisted his ankle. Petitioner worked for two days thereafter and was then out of work for six days. He received six or seven whirlpool treatments at respondent's clinic and was given an elastic bandage, which he used for some time.

Upon returning to work, petitioner resumed his original eight-hour-a-day, seven-day-a-week schedule. His work functions remained the same as before the accident. However, he claimed that he could not lift bags "as fast as [he] used to do it. I got to watch myself on it." He also testified that his ankle would swell up after he walked or ran, particularly in the summer. Finally, he asserted that he had pain in his ankle when he walked upstairs and when the weather changed.

Petitioner made no claim for temporary disability. With respect to his permanent disability claim, he asserted a claim for earnings of $400 per week because of his seven-day, 56-hour work week. It was conceded that, if the injury were compensable, he would be entitled to the maximum statutory allowance of $47 per week.

Dr. Sall testified for the petitioner. He had examined petitioner on July 25, 1980, approximately six months after the accident. His examination disclosed the following conditions: lateral malleolar fullness, inframalleolar doughiness and Achilles' thickening. He also noted that ankle dorsiflexion lacked 15 degrees; plantar flexion, 10 degrees; inversion and internal rotation, 15 degrees; and external rotation and ever-

sion, 10 degrees. He stated that the objective conditions that existed would restrict the function of the ankle in the described manner. He also testified that, assuming the petitioner could not carry as much weight or endure as much strain when lifting as before the accident, the injury had probably lessened petitioner's working ability. The doctor concluded that petitioner had suffered a lateral strain of the right ankle and evaluated permanent disability at 20% of the right foot. In his opinion, the condition was static.

Dr. Suermann testified for the respondent. He had examined the petitioner on January 27, 1981, approximately six months after Dr. Sall's examination. He found no abnormality in the ankle, a full range of motion, and no permanent disability. He did note, however, that the petitioner had complained that his ankle swelled "when he was on it a great deal."

The Judge of Compensation found that there was some residual functional disability; that there had been improvement since Dr. Sall's examination; and that the disability was "a little more than the normal here, some functional disability, which amounts to five percent of the foot; 11½ weeks at $47, $554.50." Upon respondent's appeal, the Appellate Division affirmed. We granted respondent's petition for certification. 93 N.J. 310 (1983).

## II

N.J.S.A. 34:15–36 reads in pertinent part as follows:

"Disability permanent in quality and partial in character" means a permanent impairment caused by a compensable accident or compensable occupational disease, based upon demonstrable objective medical evidence, which restricts the function of the body or of its members or organs; included in the criteria which shall be considered shall be whether there has been a lessening to a material degree of an employee's working ability. Subject to the above provisions nothing in this definition shall be construed to preclude benefits to a worker who returns to work following a compensable accident even if there be no reduction in earnings. Injuries such as minor lacerations, minor contusions, minor sprains, and scars which do not constitute significant permanent disfigurement, and occupational disease of a minor nature such as mild dermatitis and mild

bronchitis shall not constitute permanent disability within the meaning of this definition. [*N.J.S.A.* 34:15–36 (West Supp.1983–84).]

This provision was enacted as a part of extensive amendments of the workers' compensation law that became effective January 10, 1980. *L.*1979, *c. 283.* It has been said that these amendments "represent the most comprehensive reforms in the history of New Jersey's workers' compensation laws." Kumpf, "Occupational Disease Claims Under the Workers' Compensation Reforms," 12 *Seton Hall L.Rev.* 470 (1982). One of the most significant changes was the addition of the paragraph quoted above, which for the first time set forth a statutory definition of partial permanent disability.

Prior to this amendment, the workers' compensation statute had prescribed a schedule governing permanent partial disability, which provided for a specific number of weeks' compensation for the loss of certain members of the body. *N.J.S.A.* 34:15–12 c (1959). That section had also stated:

In all lesser or other cases involving permanent loss, or where the usefulness of a member or any physical function is permanently impaired, the duration of compensation shall bear such relation to the specific periods of time stated in the above schedule as the disabilities bear to those produced by the injuries named in the schedule. [*N.J.S.A.* 34:15–12c.22.]

It had become well established that "the test of liability [under that provision was] not the immediate impairment of earning power; it [was] rather the loss ensuing from personal injury which detracts from the 'former efficiency' of the workman's 'body or its members in the ordinary pursuits of life.'" *Everhart v. Newark Cleaning & Dyeing Co.,* 119 *N.J.L.* 108, 111 (E. & A.1937); *see also Katz v. Township of Howell,* 67 *N.J.* 51, 63 (1975); *Burbage v. Lee,* 87 *N.J.L.* 36, 38 (Sup.Ct.1915). *See generally* 2 A Larson, *The Law of Workmen's Compensation* § 57.14(e) (1982) (summarizing and analyzing the New Jersey case law). Thus, although the amount of the award was measured by the employee's wages, the award was designed to compensate the employee for his physical impairment.

A practical effect of this understanding of partial permanent disability under the original statute was that virtually no claim

was denied where the only issue was the existence or extent of disability. The costs of workers' compensation insurance became substantial. 1 *Governor's Economic Recovery Commission Report* 43 (1976); *see Wyatt v. Metropolitan Maintenance Co.*, 74 *N.J.* 167, 174–75 (1977) (Schreiber, J., dissenting) (discussing effects of exception to going-and-coming rule). Such problems led Governor Cahill to create the New Jersey Workmen's Compensation Study Commission (Study Commission) to study and evaluate the system, including the level and method of assessing benefits. Executive Order 39 (December 20, 1972), as amended by Executive Order 45 (January 30, 1973).

Upon completion of an in-depth analysis, the Study Commission issued a Report dated September 30, 1973. It was observed in the Report that:

> New Jersey is paying an enormous number of relatively small awards which in the aggregate consume a very substantial proportion of workmen's compensation resources. Many of these awards are for injuries which do not actually involve permanent impairment or disability.
>
> It is obvious that steps are required to remedy this conflict and that resolution of the permanent partial problem is the most critical challenge facing the New Jersey workmen's compensation system. [*Report of the New Jersey Workmen's Compensation Study Commission* 5 (1973).]

The Report also noted that "[a]ll of the statistics which we have seen show that New Jersey's proportion of expenditures for permanent partial claims exceeds that of every other state." *Id.* at 23. The Report concluded that awarding compensation for so many minor injuries had taken funds from the seriously injured workers, who were receiving grossly insufficient awards. *Id.* at 24.

The New Jersey Report alluded to a previous Report of the National Commission on State Workmen's Compensation Laws, July 1972, which had singled out New Jersey as a state in which benefits for minor injuries were particularly excessive. The national study had observed that "New Jersey expends over 35 percent of all benefit payments on minor permanent partial cases even though its maximum weekly benefit for permanent partial ($40) is far below the maximum for other classes of

benefits ($101)." *Report of the National Commission on State Workmen's Compensation Laws* 66–67 (1972). The national study had also made the following pertinent comments:

> A possible explanation of these imbalances is that the evaluation of the extent of disability in permanent partial cases permits considerable discretion for decision makers, including agency adjudicators and courts. In some States, officials apparently have stretched the rules out of sympathy for claimants with permanent partial injuries. Occasionally, because the statutory benefits were so low, every effort was made to pay those benefits freely by, for example, evaluating the extent of impairment liberally. However, because of the frequency of minor injuries, the cumulative amount of payments was substantial.
>
> For these and possibly other reasons, the total cost and the imbalance of permanent partial benefits tend to undermine the entire workmen's compensation program. Employers, disturbed by what they consider excessive payments for minor injuries, have refused to support general increases in benefits. Labor spokesmen oppose surrender of the substantial awards for minor injuries because they fear that any general benefit increases given in exchange would soon be eroded by the passage of time and the assault of inflation. The result of this stand-off has too often been the permanent impairment of reform efforts other than inconsequential or bizarre statutory amendments, such as New Jersey's differentiation between maximum benefits for permanent partial claims and maximums for other classes of benefits.
>
> We believe the States must break the log-jam barring general reform posed by the imbalances of permanent partial benefits. Workers with truly serious injuries suffer, while employers bear the costs of extravagant awards for minor injuries. [*Id.* at 67.]

In February 1978, identical bills to amend the workers' compensation laws to address these concerns were introduced in the Senate (S.802) and the Assembly (A.840). Joint hearings of the Senate Labor, Industry and Professions Committee and the Assembly Labor Committee were held in April 1979.[1] Thereafter, identical substitute bills, amended versions of which were ultimately enacted, were introduced into each legislative body.

---

[1] At these hearings there was testimony that "more than half of all payments go to people for permanent partial awards," *Public Hearings of the Senate Labor, Industry and Professions Committee and the Assembly Labor Committee on Workers' Compensation—Administrative Aspects* 10 (testimony of Douglas Barnert, Alliance of American Insurers), that New Jersey is the highest cost factor state for employers, *id.* at 28 (statement of Senator Eugene Bedell, Chairman), and that there were an inordinate number of small permanent partial disability awards, *id.*

The Senate Labor, Industry and Professions Committee's Joint Statement to the substitutes for S.802 and A.840 expressed the belief that the proposed bills

would make available additional dollars for benefits to seriously disabled workers while eliminating, clarifying or tightening awards of compensation based upon minor permanent partial disabilities not related to the employment.

They would put significantly more money into the hands of the more seriously injured workers while providing genuine reform and meaningful cost containment for New Jersey employers from unjustified workers' compensation costs that are presently among the highest in the nation.

Thus, according to the Joint Statement, the statute's primary goals were to eliminate awards for minor partial disabilities, to increase awards for the more seriously disabled, and to contain the overall cost of workers' compensation. Although such a Joint Statement may be used to ascertain legislative intent, *Brewer v. Porch*, 53 *N.J.* 167, 174 (1969), it is the statute's express language that determines in what manner and to what extent the Legislature sought to attain those goals. In the final analysis it is the statute as written that must govern.

### III

The Legislature retained the scheme in *N.J.S.A.* 34:15–12 of awarding a specific number of weeks of compensation for loss of one or more fingers or toes or of a hand, an arm, a foot or a leg. Moreover, it continued the authorization to award compensation in "all lesser or other cases involving permanent loss, or where the usefulness of a member or any physical function is permanently impaired." In such cases, the statute provided, "the duration of compensation shall bear such relation to the specific periods of time stated [in the schedule] as the disabilities bear to those produced by the injuries named in the schedule." *N.J.S.A.* 34:15–12c.22. Thus, the mechanism that had been the springboard for minor claims before the 1979 amendment remained.

When S.802 and A.840 were introduced, the definition of partial permanent disability read as follows:

"Disability permanent in quality and partial in character" means a permanent impairment caused by a compensable accident or compensable occupational disease, based upon demonstrable objective medical evidence, which restricts the

function of the body or of its members or organs, and which also lessens to a material degree an employee's working ability; provided, however, injuries such as minor lacerations, contusions, sprains, scars which do not constitute significant permanent disfigurement, simple fractures and minor occupational diseases requiring only minimal treatment shall not constitute permanent disability within the meaning of this definition.

The definition in the version of the substitute bills that were ultimately enacted read as follows:

"Disability permanent in quality and partial in character" means a permanent impairment caused by a compensable accident or compensable occupational disease, based upon demonstrable objective medical evidence, which restricts the function of the body or of its members or organs; *included in the criteria which shall be considered shall be whether there has been a lessening to a material degree of an employee's working ability. Subject to the above provisions nothing in this definition shall be construed to preclude benefits to a worker who returns to work following a compensable accident even if there be no reduction in earnings.* Injuries such as *minor* lacerations, *minor* contusions, *minor* sprains, and scars which do not constitute significant permanent disfigurement, and occupational disease of a minor nature *such as mild dermatitis and mild bronchitis* shall not constitute permanent disability within the meaning of this definition. [*N.J.S.A.* 34:15–36 (West Supp.1983–84) (emphasis added).]

The italicized language above represents changes from the bill as originally introduced. Most significant is the treatment of the "lessening to a material degree of an employee's working ability." Under the bill as originally introduced, a petitioner had to satisfy both prongs of a two-prong test. First, there had to be demonstrable objective medical evidence of a restriction of a function of the body or an organ. Second, there had to be a reduction to a material degree of an employee's working ability. The language indicated that a failure of either element would defeat the claim.

As modified and enacted, however, the statute no longer places material lessening of working ability on an equal footing with demonstrable objective medical evidence of a functional impairment. Rather, the lessening feature is only one criterion, albeit an important one, that must be considered in determining whether the disablement was so minor that the injury was not compensable. Another criterion that may be considered in determining whether the injury is significant enough to merit

compensation is whether the injury substantially interferes with other, nonwork-related aspects of petitioner's life.

■ The first essential that must be met is a satisfactory showing of demonstrable objective medical evidence of a functional restriction of the body, its members or organs. This determination can no longer rest upon petitioner's subjective complaints. The Joint Statement affixed to the substitute bills explained that "objective medical evidence is understood to mean evidence exceeding the subjective statement of the petitioner."

■ Once a permanent disability is proven by such objective evidence, the next issue is determining whether the injury is minor or is serious enough to merit compensation. Material lessening of an employee's working ability is a significant, although not necessarily controlling, criterion in making this determination.

■ Two major components of the lessening criterion are "a material degree" and an "employee's working ability." The key to what constitutes a material degree may be found in the statute. In *N.J.S.A.* 34:15–7.2 (West Supp.1983–84), relating to claims for compensation for injury or death from cardiovascular or cerebral vascular causes, material degree is defined as "an appreciable degree or a degree substantially greater than de minimis." This definition, which was adopted at the same time as the definition of permanent partial disability, sensibly purports to fulfill the function of an appropriate standard separating minor from something more than minor. Attributing the same meaning to the phrase in *N.J.S.A.* 34:15–36 is in harmony with the general rule that a word or phrase should have the same meaning throughout the statute in the absence of a clear indication to the contrary. *Oldfield v. New Jersey Realty Co.,* 1 *N.J.* 63, 69 (1948); *Jersey City v. Zink,* 133 *N.J.L.* 437, 456 (E. & A.1945); *In re Matter of Petition of Byron,* 165 *N.J.Super.* 468, 473 (Law Div.1978), aff'd o.b., 170 *N.J.Super.* 410 (App.Div.1979).

■ The second component of the lessening criterion is an "employee's working ability." This component refers to his capability to perform his work duties, as differentiated from disability in the broader sense to carry on the "ordinary pursuits of life." *See Heidel v. Wallace & Tiernan,* 37 *N.J.Super.* 522, 528–29 (Cty.Ct.1955), aff'd o.b., 21 *N.J.* 335 (1956); Napier, "Impact of the Reform Act of 1980," 96 *New Jersey Lawyer* 17, 18 (1981). Thus, the question to be answered is whether there has been an appreciable impairment of the employee's ability to work. If there has been, then the lessening criterion has been satisfied and the claim is compensable.

■ However, if there has not been an appreciable impairment of the employee's ability to work, then the inquiry must move on to other criteria. The statute expressly contemplates that the Judge of Compensation should consider other factors besides material lessening of working ability, since it refers to a material lessening as only one criterion "included in the criteria" to be considered. A second criterion is whether there has been a disability in the broader sense of impairment in carrying on the "ordinary pursuits of life." In this respect *N.J.S.A.* 34:15–36 cautions that a return to work at the same wages need not preclude compensability. This concept is an endorsement of the well-established principle in New Jersey compensation law that impairment of earnings or earning capacity is not a necessary prerequisite to a finding of partial permanent disability. *Everhart v. Newark Cleaning & Dyeing Co.,* 119 *N.J.L.* 108, 111 (E. & A.1937); *Burbage v. Lee,* 87 *N.J.L.* 36 (Sup.Ct.1915).

■ On the other hand, an injury or disease that is minor in nature—for example, minor sprain, minor laceration, minor contusion, mild dermatitis or mild bronchitis—is not compensable. Therefore, a condition that does not impair an employee's working ability will be compensable only if it is serious enough to interfere substantially with other aspects of the employee's life. *See, e.g., Stepnowski v. Specific Pharmaceuticals, Inc.,* 18 *N.J. Super.* 495, 499–500 (App.Div.1952). An injury or disease that

minimally "detracts from the 'former efficiency' of the workman's 'body or its members in the ordinary pursuits of life,' " *Everhart,* 119 *N.J.L.* at 111, is not compensable unless it is more than a minor disability.

■ In summary, then, the employee must first prove by demonstrable objective medical evidence a disability that restricts the function of his body or its members or organs. Second, he must establish either that he has suffered a lessening to a material degree of his working ability or that his disability otherwise is significant and not simply the result of a minor injury. The burden of proving both of these elements rests with the petitioner, since he has the onus of establishing permanent partial disability. *Januszewski v. Public Service Coordinated Transport,* 9 *N.J.* 107, 114 (1952); *Epps v. Gold,* 61 *N.J.Super.* 355, 361 (App.Div.1959), aff'd o.b., 32 *N.J.* 344 (1960).

## IV

■ The record in this case is unclear because of the failure of the Judge of Compensation to focus on the statutory requirements and set forth adequate findings. We have frequently emphasized the need for the articulation of adequate findings. Justice Hall expressed the principle neatly in *In re Application of Howard Savings Inst.,* 32 *N.J.* 29, 52 (1960), when he wrote:

> It is axiomatic in this State by this time that an administrative agency acting *quasi*-judicially must set forth basic findings of fact, supported by the evidence and supporting the ultimate conclusions and final determination, for the salutary purpose of informing the interested parties and any reviewing tribunal of the basis on which the final decision was reached so that it may be readily determined whether the result is sufficiently and soundly grounded or derives from arbitrary, capricious or extra-legal considerations. *New Jersey Bell Telephone Co. v. Communication Workers of America,* 5 *N.J.* 354 (1950); *cf. Grundlehner v. Dangler,* 29 *N.J.* 256, 271–272 (1959).

*See also Cunningham v. Civil Service Dep't,* 69 *N.J.* 13, 26–27 (1975); *Ward v. Scott,* 11 *N.J.* 117, 128–29 (1952).

The Judge of Compensation found that petitioner had the residuals of a strain; that there had been improvement since Dr. Sall saw him; that disability was a little more than normal, and

that there was some functional disability that amounted to five percent of the foot. The Judge did not articulate that the functional disability was based upon demonstrable objective medical evidence. This may have been so, but it is to be noted that Dr. Sall's examination occurred about a year before the hearing and the Judge had impliedly rejected Dr. Sall's conclusion that petitioner's condition was fixed and static at the time of that examination. We observe in passing that the validity of a medical finding of a permanent injury may decrease with the passage of time. Surely the Legislature, in making minor injuries noncompensable, did not intend that awards routinely be made on the basis of medical examinations performed shortly after the accidents and well before the hearings in the absence of recent objective medical evidence of continued impairment.

Moreover, Dr. Sall's testimony that petitioner's working ability had been lessened to a material degree was predicated on the false hypothesis that petitioner could not do the job "as far as carrying as much weight or strain in terms of any type of lifting." The record does not support that assumption. The petitioner had testified that he carried on his job as before the accident, working 56 hours per week. His only job-related complaint was that he could not lift bags as fast as he had before the accident. Since the value of Dr. Sall's answer to the hypothetical question depends on the soundness of the assumptions, *Stanley Co. v. Hercules Powder Co.*, 16 *N.J.* 295, 305 (1954); *see Evid.R.* 56(2), the proof evident from his answer is questionable. As we are remanding the matter, the petitioner should be afforded an opportunity to explore the extent to which there was a lessening of his working ability.

The Judge of Compensation did not indicate whether he found that there was or was not a lessening to a material degree of the employee's working ability. We do not know whether he accepted Dr. Sall's opinion that the injury had lessened petitioner's working ability, predicated as it was on an erroneous assumption. We cannot ascertain if he concluded that petitioner's working ability was not materially lessened but determined that

the injury was nevertheless significant because of its effect on other aspects of petitioner's life. A finding with respect to working ability is desirable and under some circumstances essential, since *N.J.S.A.* 34:15–36 specifically provides that this criterion "shall be considered." Assuredly, adequate findings and conclusions of fact would also enable a reviewing court to perform its functions intelligently.

The cause is remanded for further proceedings to the Division of Workers' Compensation. Costs to abide the event.

*For remandment*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*Opposed*—None.