STEVE POSWIATOWSKI, PETITIONER-APPELLANT, v.
STANDARD CHLORINE CHEMICAL CO.,
RESPONDENT-RESPONDENT.

CAROLE RAE FAGAN, PETITIONER-APPELLANT, v. CITY OF
ATLANTIC CITY, RESPONDENT-RESPONDENT.

EDWARD SMITH, PETITIONER-RESPONDENT, v. UNITED
STATES PIPE AND FOUNDRY COMPANY,
RESPONDENT-APPELLANT.

Argued February 22, 1984—Decided May 24, 1984.

*Louis David Balk* argued the cause for appellant Steve Poswiatowski (*Balk & Balk*, attorneys).

*Kenneth D. Mackler* argued the cause for appellant Carole Rae Fagan (*Goldenberg, Mackler & Sayegh*, attorneys; *Lawrence A. Mintz*, on the brief).

*Christopher J. Bednarz* argued the cause for appellant United States Pipe and Foundry Company (*Haskins, Hack, Piro & O'Day*, attorneys; *David L. Hack*, on the brief).

*Edward Slaughter, Jr.* argued the cause for respondent Edward Smith (*Pellettieri, Rabstein and Altman*, attorneys).

*Robert G. Bressler* argued the cause for respondent Standard Chlorine Chemical Co.

*James P. Savio* argued the cause for respondent City of Atlantic City (*Gormley & Savio*, attorneys).

The opinion of the Court was delivered by

O'HERN, J.

This appeal concerns the proper measure of benefits for injured workers under amended sections of the Workers' Compensation Act, *N.J.S.A.* 34:15–1 to –128. *L.* 1979, *c.* 283. The issue is whether multiple injuries arising out of the same accident should be compensated separately or cumulatively under the revised schedule of payments that increases weekly awards as the percentage of disability increases. The question arises because one sentence in *N.J.S.A.* 34:15–12(c), as amended and effective January 10, 1980, states:

> When a claim petition alleges more than one disability, the number of weeks in the award shall be determined and entered separately for each such disability and the number of weeks for each disability shall not be cumulative when entering an award.

We hold that the separate injuries arising out of the same accident should be treated for purposes of compensation as they affect the worker: cumulative in impact, resulting in a single compensable disability within the meaning of *N.J.S.A.* 34:15–36.

Workers' compensation benefits for permanent disability are calculated by translating the worker's loss into a stated number of weeks and paying the worker a sum of money per week over the period. Thus the loss of a hand is equated with 245 weeks, a leg 315 weeks, and a foot 230 weeks. *N.J.S.A.* 34:15–12(c). Partial losses are expressed in percentages; for example, the loss of the first phalange of a finger is considered the loss of one-half of the finger. *N.J.S.A.* 34:15–12(c)(12). The loss of an unscheduled bodily function—for example, a back injury—is equated with a percentage of total disability (now 600 weeks). *N.J.S.A.* 34:15–12(c)(22). A 15% loss of function of the back, then, is equated with 90 weeks of disability. Under prior law it made no difference whether multiple injuries were cumulated or separated for purposes of computing the awards, since, for the most part, there was a flat rate of compensation, $40 for each week of disability. Whether it was calculated as 60 weeks

at $40 per week plus 40 weeks at $40 per week, or 100 weeks at $40 per week was obviously irrelevant.

But under the new schedule of benefits set forth in *N.J.S.A.* 34:15–12(c), the difference is of great significance. If the weeks due the injuries are added together when entering an award, more money is awarded. By the 1979 amendments, *L.* 1979, *c.* 283, § 5, the Legislature not only increased the weekly rate for permanent disability from a maximum of $40 to a maximum of 75% of statewide average weekly wage (SAWW), but also created a sliding scale of weekly dollar payments ranging from $47 where the adjudicated disability requires payment for 90 weeks or less, up to $82 for the last six weeks of disability for which 180 weeks of payments are required. Over 180 weeks of entitlement, there is a dramatic increase in weekly dollars payable. From 181 up to 600 weeks, disability is compensated from a low of 35% of SAWW (for disabilities drawing entitlement of from 181 to 210 weeks), to a maximum of 75% of SAWW (for disabilities falling within the 421– to 600–weeks bracket.) [1] *See Gothelf v. Oak Point Dairies of N.J.*, 184 *N.J.Super.* 274 (App.Div.1982).

A simplified example will illustrate the statutory scheme: A 30% loss of function of a leg equates with 94.5 weeks of disability; a 15% loss of function of the back is equated with 90 weeks of disability. Under the 1980 revision, the award will have significantly different cash value, depending on the meth-

---

[1] *N.J.S.A.* 34:15–12(c) provides that after January 1, 1982, the specific sliding scale of dollar amounts listed for the first 180 weeks in the Disability Wage and Compensation Schedule was replaced by a sliding scale of percentages of SAWW. The $47 minimum has been replaced by 20% of SAWW, $49 by 21% of SAWW, and so on. These percentage figures grow by increments of 1%. After 210 weeks, to which 35% of SAWW is allocable, the percentage of SAWW for each succeeding 30–week bracket increases by 5%. In addition, until the 180th week, the award is clearly calculated on a rising basis with later weeks higher than the earlier ones. We granted certification in *Heaton v. Jersey Central Power & Light Co.*, 95 *N.J.* 204 (1983), to consider whether the schedule is at a flat percentage after the 181st week.

od of calculation. Using the rates in effect prior to January 1, 1982, and the 1978 SAWW of $245.58, the awards would be:

| | Separate | | | Cumulative | |
|---|---|---|---|---|---|
| 30% Leg: | 94.5 wks @ $49/wk | = $4630 | 184.5 wks @ 35% of SAWW, or | |
| 15% Back: | 90 wks @ $47/wk | = 4230 | 184.5 @ $85.95 = $15,857.77 | |
| Total award | | $8860 | $15,857.77 | |

This latter method has been referred to in some of the cases as "stacking," a phrase that has been used in another context to denote the availability of additional insurance coverage after exhaustion of primary coverage. See Lundy v. Aetna Cas. & Sur. Co., 92 N.J. 550, 555 (1983). The issue here is the rate of compensation. The three cases before us present an opportunity to test the issue in distinct factual settings. A brief description of each case follows; a detailed statement is set forth in the opinions below.

Steve Poswiatowski fell onto a concrete landing, fracturing his back and left foot. The compensation court described him as a "reticent person," having "more troublesome complaints than he projected." That court awarded 20% of total (120 weeks) for the fractures of the T–12 and L–1 vertebrae, 40% of the left foot (92 weeks) for that fracture, and 10% of total (60 weeks) for the neuropsychiatric component. Believing that each award should be entered separately, the court found petitioner entitled to $6024 for the back, $4328 for the foot, and $2820 for the neuropsychiatric component, a total of $13,172. The Appellate Division affirmed the award on the issue of stacking. Tucker v. Central Paper Co., 191 N.J.Super. 371 (1983). It modified the award to correct an error in the method of averaging weekly payments. In that court's view,

> [i]t is the new upwardly sliding scale of dollars payable, depending upon the number of weeks allocable to determine disability, that required the need for the Legislature to impose the requirement that separate and distinct disabilities be "determined and entered separately for each such disability" and that they not be cumulatively entered. [Id. at 383.]

Petitioner argues that, being a more severely injured worker, he should have received the rate called for by the statute: 272 weeks of disability at 50% of SAWW ($123), a total of $33,456. We granted his petition for certification. 95 *N.J.* 196 (1983).

Carole Rae Fagan was employed as an Atlantic City public health nurse. While on a house call, in the course of her duties, she was robbed and brutally attacked by several males. She believes that she was beaten with a wooden fence post. She lost consciousness at first but was later able to crawl to a nearby residence to call the police. She suffered a concussion, a fractured nose, facial scarring, and sinus disorders. Since then, she has experienced facial numbness, periodic severe headaches, and recurrent nightmares associated with the incident. The compensation court awarded 7½% permanent partial disability (45 weeks) attributable to the fractured nose with deviated septum, 7½% permanent partial disability (45 weeks) attributable to residuals of the severe contusions of the skull, lips, and mouth with numbness in her face, and 15% of permanent partial disability (90 weeks) attributable to the post-traumatic nightmares. It calculated the injuries and found "[i]n all, the award entitled petitioner to 180 weeks at the average weekly rate [for 180 weeks] amounting to $10,314."

The Appellate Division believed that the legislative history of the amendments supported entering the weeks allocable for each disability separately "and not stacked on each other or a worker who is not truly severely disabled as a functioning economic unit may achieve that result in dollars." 191 *N.J.Super.* 511, 517 (1983). It reversed and, computing each disability separately, found petitioner entitled to 45 weeks at $47 a week for the first disability, 45 weeks at $47 for the second, and 90 weeks at $47 for the third, for a total of $8460. *Id.* at 516–17. We granted the employee's petition for certification. 95 *N.J.* 221 (1983).

Edward Smith, a scrap burner, suffered a crushing injury of his right forearm when a crane toppled over, pinning his arm

under heavy material. After doctors removed the damaged tissue, the arteries, nerves, and tendons of petitioner's arm were left exposed. Because plastic surgery required grafting of skin from his abdomen to the site of the injury, he spent three months in the hospital with his right arm attached to the right side of his abdomen. Surgery later detached the two. Another skin graft was needed, this time from the thigh. Smith is scarred on the forearm and the donor sites, abdomen and thigh. He was out of work for over a year.

The compensation court awarded 23% of total disability (138 weeks) for the two major members, apportioning 50% to the right hand for orthopedic, neurological, and cosmetic disability, and 5% to the right leg for cosmetic disability due to the scarring; 10% of total (60 weeks) for cosmetic disability for scarring to the abdomen; and 12½% of total (75 weeks) for the neuropsychiatric disability. Believing that each award should be entered separately, it found petitioner entitled to 138¼ weeks at $66 per week for the hand and leg; 60 weeks at $47 for the abdominal scar; and 75 weeks at $47 for the neuropsychiatric component. This it totalled to $15,468 to be paid over the 273 weeks at a rate of $156 per week.

The petitioner believed that he should receive the statutory rate for 273¼ weeks, 50% of SAWW, for a total award of $33,759.

The Appellate Division agreed in substance with petitioner's appeal. In that panel's view, the interpretation provided by the compensation court was inconsistent with the purposes of the 1980 amendments:

> We are of the view that where, as here, separate and distinct classes of disability are the result of a single traumatic injury, the award of compensation, while separately stated to identify the classes, should be cumulated in computing the award to provide the enhanced benefits available. [191 *N.J.Super.* 454, 462 (1983).]

The court suggested that on the remand two other errors be corrected: the statement of the award evaluating the leg and hand injuries in separate percentages, and a mathematical error

in computing the award. We granted the employer's petition for certification. 95 *N.J.* 225 (1983).

All parties point to the same source, legislative purpose, to find the meaning of *N.J.S.A.* 34:15–12(c). Not surprisingly, the source is enigmatic. It reflects, as did the legislation, a unique compromise between labor and industry to achieve what the *Smith* panel saw as somewhat contradictory purposes. We recently had occasion to review the purposes of the legislation:

The Senate Labor, Industry and Professions Committee's Joint Statement to the substitutes for S.802 and A.840 expressed the belief that the proposed bills

would make available additional dollars for benefits to seriously disabled workers while eliminating, clarifying or tightening awards of compensation based upon minor permanent partial disabilities not related to the employment.

They would put significantly more money into the hands of the more seriously injured workers while providing genuine reform and meaningful cost containment for New Jersey employers from unjustified workers' compensation costs that are presently among the highest in the nation.

Thus, according to the Joint Statement, the statute's primary goals were to eliminate awards for minor partial disabilities, to increase awards for the more seriously disabled, and to contain the overall cost of workers' compensation. [*Perez v. Pantasote, Inc.*, 95 *N.J.* 105, 114 (1984).]

We believe that the *Smith* case best illustrates the method most consistent with statutory purpose. It would be difficult not to see that petitioner as the "more seriously injured worker" whom the Legislature meant to assist. The principal defect of the prior law was that "awarding compensation for so many minor injuries had taken funds from the seriously injured workers, who were receiving grossly insufficient awards." *Report of the New Jersey Workmen's Compensation Study Commission* 24 (1973), *cited in Perez*, 95 *N.J.* at 112. Yet, even under prior law, Smith would have received 250 weeks at $40 a week, or close to $10,000. The sponsors of the new legislation emphasized that in exchange for weeding out the trivial and insignificant cases, the bill would "put significantly more money into the hands of the more seriously injured workers." Joint Statement to S.802, at 1 (1979).

To reflect the type of increase in awards for serious injury that was intended, the Joint Statement goes on:

> Calculated on the basis of the statewide average weekly wage used to determine 1979 awards, maximum awards for workers for work-related amputations would increase by approximately these amounts: arm—$12,000.00 to $55,-340.00; leg—$11,000.00 to $52,825.00; hand—$9,200.00 to $33,440.00; and foot —$8,000.00 to $28,100.00. [*Id.*]

A further example of the Legislature's intent is reflected in the increased awards for permanent loss or impairment under *N.J.S.A.* 34:15–12(c)(22). Previously, the scale was for 550 weeks and the top award was $40. Therefore, an award for 30% permanent impairment was $6600. The amendments changed the scale to 600 weeks and a top award of 75% of SAWW. With a 1978 SAWW of $245.58, the same 30% permanent disability would yield an award of $10,314.00; a 60% permanent disability award would go from $13,200 to $53,-042.40—a fourfold increase.

Although the arguments to the contrary are substantial, as evidenced by the differing views in the Appellate Division, we find the more persuasive direction in the Legislature's stated intent to "put significantly more money into the hands of the more seriously injured workers." It would become a hollow phrase if the disability of a worker as severely injured as Smith were to be divided up at a lower rate for purposes of compensation, resulting in an award that would not reflect the kind of increase the sponsors intended. Smith did not experience his injuries as separable complaints; he required the skin grafts from his abdomen and thigh to treat his crushed arm. It is their cumulative nature that has affected his working ability and we believe the Legislature meant to compensate him in the same way.

This interpretation would come closest to giving the word "disability" in *N.J.S.A.* 34:15–12(c) the same meaning that it has in *N.J.S.A.* 34:15–36. In *Perez*, we emphasized that the words and phrases of the statute "should have the same meaning throughout the statute in the absence of a clear indication to

the contrary." 95 *N.J.* at 116. We defined a compensable "disability" under the new act:

> In summary, then, the employee must first prove by demonstrable objective medical evidence a disability that restricts the function of his body or its members or organs. Second, he must establish either that he has suffered a lessening to a material degree of his working ability or that his disability otherwise is significant and not simply the result of a minor injury. The burden of proving both of these elements rests with the petitioner, since he has the onus of establishing permanent partial disability. [*Id.* at 118.]

This is a significant requirement. Compensation judges must make findings that reflect an evaluation of the multiple injuries in determining whether there is a compensable disability; they must treat the individual as a whole in determining the statutory disability. The method is familiar: "It is not to be solved by adding up the fractional parts, but upon the basis of the percentage of total and permanent disability reasonably found to be produced by the several injuries considered collectively and with due regard to their cumulative effect." *Orlando v. F. Ferguson & Son,* 90 *N.J.L.* 553, 557–58 (E. & A.1917) (evaluating loss of two or more major members).

There is no "clear indication to the contrary" that we should construe disability differently in *N.J.S.A.* 34:15–12(c) from the construction in 34:15–36. The only relevant legislative history was the testimony of an industry representative at a joint hearing on administrative aspects of the bill. The witness described the problem of a "shotgun approach to claims" for occupational diseases—a claim form listing all possible affected areas, even where the causal connection between the work and the disability is tenuous. *Public Hearing Before the Senate Labor, Industry and Professions Committee and the Assembly Labor Committee on Workers' Compensation—Administrative Aspects* 20–21 (1979) (statement of Eileen M. Measel). According to the witness, this occurs "particularly when there are plant closings or layoffs of a substantial nature" and the last employer is confronted with an occupational disease claim that may be traceable to several periods of employment or previous employers. However, this concern is far removed

from the present situation of multiple injuries stemming from a single traumatic incident. *See also* Kumpf, "Occupational Disease Claims Under the Workers' Compensation Reforms," 12 *Seton Hall L.Rev.* 470, 483 (1982) ("[T]he new section 34:15–12(c) is concerned only with negating any advantage resulting from the misjoinder of more than one disability in a single claim petition.").

We do not find in the act's history evident legislative intent that the provisions of 12(c) should promote the other purpose of the act—cost containment. While it is true that not all the cost containment provisions of the act were discussed in the Joint Statement,[2] see *N.J.S.A.* 34:15–37 (eliminating reconstructed wages in determining the rate for temporary disability), and *N.J.S.A.* 34:15–95 (eliminating the defense of aggravation from those used against the employer by the Second Injury Fund), the dramatic impact that a changed definition of "disability" would have—more than halving awards in many cases—convinces us that it would have been highlighted had the Legislature intended that effect.

The Legislature's intent both to increase awards and contain employers' costs is reflected in the amendment of *N.J.S.A.* 34:15–12(c) and (d), as discussed in *Abdullah v. S.B. Thomas, Inc.*, 190 *N.J.Super.* 26 (App.Div.1983). If a worker with a pre-existing disability of 37½% of partial total is rendered 50% disabled by a subsequent compensable accident, the worker is awarded 50% partial total (50% of SAWW for 300 weeks), not 12½% partial total ($47 for 75 weeks). The employer is then entitled to a credit of 37½% partial total (40% of SAWW for 225 weeks). *Id.* at 33–34.

_____

[2]The Joint Statement listed nine ways that the legislation would aid employers by limiting costs. These included: allowing credits for pre-existing disabilities; tightening proof requirements for cardiac claims; requiring objective medical evidence of permanent partial disability; excluding most injuries sustained during recreational or social activities; and limiting the "going and coming" rule. Joint Statement, *supra*, at 2, *reprinted in Smith*, 191 *N.J.Super.* at 460–61.

A worker 50% disabled has sustained a severe loss of functional ability. Whether that degree of injury resulted from a single compensable accident or from a compensable accident that aggravated and enlarged a previous loss of function, the effect upon the worker is the same. [*Id.* at 35.]

It is this focus on the functional ability of the worker that we emphasized in *Perez, supra,* 95 *N.J.* at 116. We conclude that the better view is that the quoted sentence of *N.J.S.A.* 34:15–12(c) was intended to apply to cases in which separately compensable occupational disabilities are pleaded in a single claim petition, or cases of misjoinder of separate accidents, but not to separate injuries from a single accident that result in a compensable disability involving a material lessening of working ability or significant functional loss for the worker.

Prior case law does not dictate a contrary result. Justice Wachenfeld's statement in *Cooper v. Cities Serv. Oil Co.,* 137 *N.J.L.* 181, 183 (E. & A.1948), that "[s]eparate and distinct classes of partial incapacity, though resulting from the same accident, are individually compensable" must be taken in its context. The issue was whether the schedule award for injury to scheduled members precluded an award for neurosis. The worker had lost the right eye and had partial loss of the left, resulting in 55% of permanent partial disability. The question was whether any award could be made for neurosis resulting from the loss of sight, not whether there had to be separate calculation of an award under a graduated schedule of payments. It was in this same context that *Sigley v. Marathon Razor Blade Co., Inc.,* 111 *N.J.L.* 25 (E. & A.1933), held that a schedule award for total loss of an eye does not preclude award for neurosis alleged to be incident to loss of the eye and said: "They were cumulative disabilities distinct in their nature." *Id.* at 29. These cases focused on the schedule for the definition of injury. But *Everhart v. Newark Cleaning & Dyeing Co.,* 119 *N.J.L.* 108 (E. & A.1937), explained that "[t]he key to the meaning of the legislature is not to be looked for there." *Id.* at 113 (quoting *Ball v. William Hunt & Sons, Ltd.,* 1912 *A.C.* 496). Rather, the schedule only prescribed the scales and conditions of compensation. Thus, "you must not resort to the

schedule for the purpose of cutting down the right to compensation," but must give the statute's words "a meaning * * * that is necessary to forward and effect the main purpose and object of the enactment." *Id.* at 113–14. In the present cases, then, the meaning of the schedule is not to be looked for in the separate and independent injuries that create the disability.[3]

Counsel for certain of the employers before us were candid in admitting that a literal interpretation of 12(c) would not always obtain. They conceded that certain separate injuries should be stacked—for example, injuries to the same area of the body, as with Carole Fagan's deviated septum and scarring; that neurological (motor reflex and nerve root) injuries could be stacked with orthopedic (bone and muscle) injuries to the same part of the body; and that in "rare occasions where the proofs are clear, multiple injuries that cumulate to create a single disability" may be stacked. Implicit in these illustrations was a recognition that the overriding principle that should guide us is effectuation of the purposes of the legislation.

We need not be concerned that a series of niggling injuries will enable a worker to obtain an unwarranted award. The breakoff point never escalates dramatically until the 30% plateau is reached. We are confident that compensation judges can evaluate the total disability and give proper weight to the multiple injuries when fashioning an award; they will not allow the random presence of stray weeks attributable, let us say, to an extra lost tooth (4 weeks), artificially to push a case over the top. They are as aware as counsel of the sharp break in

---

[3]The literal language of the employee's claim petition now in use by the Division (WC4–1) calls for a "[d]escription of each and every injury" breaking them down into orthopedic, neurological, neuropsychiatric, and other. *N.J. A.C.* 12:235–4.2(a)(6) calls for a "complete, accurate description of each and every injury alleged" in each complaint. The form of judgment now in use (WC–100) refers only to an award for "disability."

benefits after 180 weeks. Employers need not fear aberrational results because of our holding that stacking is required.

Finally, we are asked to clarify the proper method of computing an award for permanent partial disability where two or more major members are injured. In the *Smith* decision, the court stated that the compensation judge "may have violated the rule in *Vishney v. Empire Steel and Iron Co.,*" 87 *N.J.L.* 481 (Sup.Ct.1915), when he expressed the 50% hand and 5% leg disability as their equivalent value of 23% of partial total. 191 *N.J.Super.* at 463–64. According to the 1980 schedule, 50% of the hand is 122.5 weeks of compensation and 5% of the leg is 15.75 weeks, for a total of 138.25 weeks. Since 23% of the 600–week scale is 138 weeks, the employee contends the rule of *Vishney* was not violated.

■■ Of course, if the compensation judge uses the schedule as an aid in determining the extent of the award, such may be regarded as a reasonable finding if expressed in terms of permanent partial disability. *Orlando v. F. Ferguson & Son, supra,* 90 *N.J.L.* at 553. But the point of the *Smith* panel is to focus on the nature of the injury. The method of calculating permanent partial disability to two or more major body members under *N.J.S.A.* 34:15–12(c)(20), –12(c)(22), has not been affected by the 1980 amendments. The compensation court is not to determine the scheduled number of weeks for each injury separately; rather, it is to look at the effect of the injuries and to make a reasonable assessment of the extent of the combined disability in terms of a percentage of permanent and total disability. This requires the court to make a judgment about the extent of impairment resulting from the combined injuries without being limited by the statutory schedules. *See Cooper v. Cities Serv. Oil Co., supra,* 137 *N.J.L.* at 182; *Orlando v. F. Ferguson & Son, supra,* 90 *N.J.L.* at 557; *Vishney v. Empire Steel & Iron Co., supra,* 87 *N.J.L.* at 483–84.

We hold that the weeks of compensation awarded for one accident's multiple injuries that establish a single compensable

disability should be cumulated, not separated, in computing the award. The judgments in *Fagan* and *Poswiatowski* are reversed and remanded to the Division of Workers' Compensation to compute the award in accordance with this opinion. The judgment in *Smith* is affirmed.

*For affirmance and reversal*—Chief Justice WILENTZ, and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*Opposed*—None.