WILLIE CROOMS, PETITIONER-APPELLANT, v. CENTRAL
STEEL DRUM CO., RESPONDENT-RESPONDENT, AND
SECOND INJURY FUND, RESPONDENT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 31, 1977—Decided January 27, 1978.

Before Judges CONFORD, MICHELS and PRESSLER.

*Mr. Samuel E. Bass* argued the cause for appellant (*Messrs. Freeman & Bass,* attorneys).

*Ms. Pamela J. Paxton,* Deputy Attorney General, argued the cause for respondent Commissioner of Labor and Industry as Trustee of the Second Injury Fund (*Mr. William F. Hyland,* Attorney General of New Jersey; *Ms. Erminie L. Conley,* Deputy Attorney General, of counsel).

*Mr. Samuel D. Lord* argued the cause for the respondent Central Steel Drum Co. (*Messrs. McElroy, Connell, Foley & Geiser,* attorneys).

The opinion of the court was delivered by

PRESSLER, J. A. D. This is a worker's compensation case. The issue before us is whether there is a basis in this record upon which the judge of compensation could reasonably have

concluded, as he did, that petitioner was not, by reason of the odd-lot doctrine, totally disabled. Unable to perceive any justification for the denial of the benefit of the odd-lot doctrine to this petitioner, we are constrained to reverse.

We need not retread the ground so recently and thoroughly covered in the analyses by the Supreme Court of the development, substance and proper application of the odd-lot doctrine. See *Zanchi v. S. & K. Const. Co.,* 63 *N. J.* 331 (1973); *Barbato v. Alsan Masonry,* 64 *N. J.* 514 (1974); *Oglesby v. American Dredging Co.,* 64 *N. J.* 538 (1974); *Germain v. Cool Rite Corp.,* 70 *N. J.* 1 (1976). Suffice it to say that enlightened social policy imposes upon the employer responsibility for a worker whose unemployability on a regular basis in a reasonably stable job market results not only from the direct medical consequences of a work-connected accident but also from the combination of those consequences, in themselves less than totally disabling, with the worker's personal handicaps. In our judgment this petitioner, by the clear weight of the evidence, presents a classic and poignant illustration of what the odd-lot doctrine is all about.

Petitioner was born in Florida in 1932. He went to what he described as a segregated school until he was nine. Whether because of his intellectual limitations (I. Q. testing performed for purposes of this hearing placed him at the borderline between mentally deficient and dull normal) or because of the quality of pre-war rural Florida segregated grade school education, or because of both, he has remained a functional illiterate, incapable of meaningful oral or written communication and lacking even rudimentary arithmetic skills. Able-bodied, however, he performed manual labor on a farm from the time he left school until he was 20 years old, when he migrated north and settled in Newark. There he obtained employment from this respondent, Central Steel Drum Co., for whom he worked for the next nineteen years, and until his employment was terminated in 1971. He has not worked since.

Petitioner's job at Central Steel Drum Co. was primarily that of sandblasting empty drums to cleanse them of their chemical, and sometimes noxiously chemical, residues. He was also at times assigned to straightening out the dents in used drums. As might be expected, his health and vitality were not unaffected by this daily work. As of the date of the filing of this petition he had suffered during the second decade of his employment six compensable events. In 1962 he fell and hit his head, an accident resulting in a worker's compensation award of $2\frac{1}{2}\%$ partial permanent disability based on the neurological residuals. A petition filed several years later was resolved by a stipulation of dismissal entered upon his agreement to accept 1% of partial permanent disability for an orthopedic injury. By this time he had begun to react to his constant occupational exposure to noxious fumes and in December 1964, was awarded 6% of partial permanent disability for his chronic bronchitis attributable thereto. In 1967 he filed his fourth claim petition, based on a head injury he sustained when accidentally struck with a hammer by a coworker. He received an award of 2% of partial permanent disability for the post-concussive residuals of that episode. In 1969, his hearing now having been affected by the sandblasting, he was awarded 17% of partial permanent disability for a binaural hearing loss. His additional claim for increased disability based on an increase in his pulmonary disability was then, however, denied. It was two years later, on June 30, 1971, that his employment was terminated, his undisputed explanation therefor being that "well, they laid me off on account I was going to the doctor and being absent." The sixth petition, filed after petitioner was laid off, sought an adjudication for his occupational exposure to fumes, dust and noise between the time of the 1969 award and the termination of employment. The hearing on this petition, the transcript of which we have reviewed, was held in February 1973 and resulted in a finding that while petitioner had sustained no further hearing loss, he had sustained an ad-

ditional 5% of partial permanent disability because of further pulmonary aggravation evidenced not only by the chronic bronchitis but also by the development of pulmonary fibrosis. This petition, the seventh, together with a petition against the Second Injury Fund, was filed later in 1973, and sought modification to 100% of the earlier 1973 award.

Petitioner's theory, as clearly developed during the course of the hearing on this petition, was not based upon any allegation of increased pulmonary or hearing disability. It was rather his theory that his physical disabilities had made it impossible for him to continue as a manual laborer, the only work he could do. His preoccupation with his deteriorated state of health and his appreciation of the impact of that deterioration on his ability to work contributed to a neuro-psychiatric problem manifested by a severe depression. That depression, in combination with the physical disabilities and his personal handicaps of greatly limited intelligence, illiteracy, lack of education, lack of any experience, skill or training in any work but manual labor, left him not only unemployable but essentially nonfunctional on any level, his life-style having become that of a shut-in.[1]

Clearly, if all of the elements of this proposition were proved, application of the odd-lot doctrine would be ineluctable. We are persuaded, moreover, that a fair appraisal of this record admits of no other conclusion. The work-related hearing loss, the chronic bronchitis and the pulmonary fibrosis were all undisputed, as was petitioner's inability by reason thereof to return to his former employment or to obtain any similar employment. He does not have the

---

[1]Illustrative of his present life-style was this response to the inquiry as to how he spends his time since he stopped working: "Well, I been sick and I stays in the house. I don't get much sleep at night. I do a little sleeping in the day." When asked why he was no longer working, he replied, "Well, like, my condition, on account of my condition," which he then explained as meaning "My chest pain and my throat and I snap my back too." He further volunteered that "I still have the cough. I do most of it at night."

lung capacity for heavy or sustained manual labor. Nor was there any real dispute as to the extent of petitioner's personal handicaps. This combination of physical disabilities and personal handicaps alone left him fit, according to the testimony of respondent-employer's neuropsychiatric expert, only for such employment as "work as a porter, sweeping floors within reason or sorting garbage within reason."

 While these circumstances by themselves might well have justified application of the odd-lot doctrine, we regard the added factor of petitioner's psychiatric condition to have compelled its application. Petitioner's alleged neuropsychiatric sequelae were essentially all that was in factual dispute here. In attempting to establish them petitioner relied on both the testimony and written reports of psychiatric witnesses whose opinions and the factual support therefor were persuasive of the conclusion that petitioner was suffering from a work-connected and disabling depression. Most telling, however, was the testimony of the psychiatric witness for the Second Injury Fund, who agreed that petitioner, on examination, appeared "sad and depressed." His diagnosis was "depressed reaction in a schizoid personality with hypochondrial trend," to which psychiatric disorder he ascribed a permanent disability of $12\frac{1}{2}\%$. It was his further opinion that the triggering of the clinical manifestations of this disorder was reasonably attributable to petitioner's work experiences, their effect on his health and his consequent inability to retain his job. The only note of dissension in the tenor of these proofs was the opinion of the respondent-employer's psychiatric expert, who found petitioner to be neuropsychiatrically "normal." It was this expert's testimony that "From the psychiatric aspect, he was pleasant, he was affable, he was relaxed." Having found no psychiatric problem at all he was, a fortiori, unable to ascribe a psychiatric problem to the employment. The apparent superficiality of this expert's opinion of normalcy and the gross inconsistency of that opinion with every other indication in the case moved the judge of compensation to reject it and to find as a fact that

petitioner's inability to work was caused by his "present condition of depression."

Nevertheless, the compensation judge declined to modify the previous award either on the basis of the depressive condition or on the basis of the odd-lot doctrine for the stated reason that he found the depressive condition not to have resulted from employment-related factors but rather that it "developed as a result of his being unable to find a job." As he further explicated:

> \* \* \* I cannot say that the fact that he was laid off here started a chain of events which led him to become depressed; it was due to outside influences, economic in nature, over which the employer would have no control.
>
> This is a difficult thing to decide, because we know that there are numerous people who are only able to do labor work or menial tasks; however, when the time comes that they are laid off or the plant closes and there is no work, they are unable to get another job, although they are physically able to work under normal conditions.

It was also his observation that while petitioner's mental capacity is low and he could probably not compete in a labor market which is depressed, he would be able to get a job in an improved labor market. And it was finally his conclusion that the neuropsychiatric disability was too remote in time from the last work exposure to be employment-related, particularly in view of petitioner's intervening hospitalizations.[2]

These findings and conclusions are, in our view, not founded on substantial credible evidence and are inconsistent with applicable law. The judge's finding that the depressive disorder was not significantly work-connected was contrary to the proofs. Certainly there was no support for that finding in respondent's expert's testimony since the judge re-

---

[2] The proofs indicated that subsequent to the termination of his employment petitioner had been hospitalized once for double pneumonia and once for a nosebleed.

jected the expert's basic predicate, namely, that there was no psychiatric abnormality at all. Anything the expert might have offered or implied as to causation could obviously carry no weight if he refused to acknowledge the very existence of the condition whose cause was being inquired into. In short, the expert's minor proposition fell with his major one. More basically, however, the undisputed proofs were in direct contradiction to the judge's characterization of petitioner as a man suffering emotional distress after having lost his job in a tight labor market offering limited reemployment opportunities. The whole point here is that this was not, as the judge suggested, a situation where a plant closed down or where there was a lay-off because of an excessive work force. What happened here is that petitioner lost his job because the physical demands which that job had imposed upon him for nearly twenty years finally left him physically unfit to perform it any longer. And it was the extent of that physical impairment together with his personal limitations which effectively put him out of the existing and presumably stable job market[3] and which resulted in his neuropsychiatric symptomatology. That neuropsychiatric symptomatology in its turn further contributed to his unemployability. With each of these adverse factors continuously operating to aggravate the others we have no doubt that petitioner is not realistically employable in the current labor market or in any improved labor market reasonably foreseeable. He is, in short, by definition, the prototype odd-lot.

---

[3]There were no proofs adduced here regarding the actual nature of the Newark job market in recent years for unskilled black males such as petitioner. We take judicial notice because it is common knowledge and a matter of State and national concern that this is a job market characterized by an inordinately high degree of unemployment. There is no proof here adduced as to any significant fluctuation in the last five or six years. We see no reason why the test of a reasonably stable job market is not met where the stability level is one of prolonged depression for a given category of worker

■ While we find petitioner entitled to a judgment of total permanent disability against the respondent, we find no merit in his claim against the Second Injury Fund. From what we have said, it is clear that the petitioner's total disability is in no part referable to a prior non-compensable condition and hence he is not an eligible claimant under *N. J. S. A.* 34:15–95. And see *Paul v. Baltimore Upholstering Co.,* 66 *N. J.* 111 (1974).

Affirmed as to the Second Injury Fund. Reversed and remanded for entry of judgment against the employer-respondent consistent herewith.