221 N.J. Super. 301 (1987)
534 A.2d 428
JOSE RAFAEL PADILLA, PETITIONER-RESPONDENT,
v.
CONCORD PLASTICS, INC., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 2, 1987.
Decided December 8, 1987.
*302 Before Judges DREIER and BAIME.
Fred S. Brause, Jr., attorney for appellant (Sheldon Schiffman, on the brief).
Albert W. Seaman, attorney for respondent Jose Rafael Padilla (George M. Boyd, on the brief).
W. Cary Edwards, Attorney General, attorney for respondent Commissioner of Labor as Trustee of the Second Injury *303 Fund (Lawrence G. Moncher, Deputy Attorney General, on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
This is an appeal from a determination of the Division of Workers' Compensation finding petitioner Jose Rafael Padilla permanently and totally disabled and awarding him an additional 30% for amputation of his hand as the result of an industrial accident. Petitioner's employer, Concord Plastics, Inc. (Concord), argues that (1) the compensation judge's application of the odd-lot doctrine was not grounded in sufficient credible evidence present in the record, (2) its motion to join the Second Injury Fund was erroneously denied and (3) the Workers' Compensation Act (N.J.S.A. 34:15-1 et seq.) does not permit the award of an amputation increment to a permanently and totally disabled claimant. While we find no merit in Concord's first two contentions, we agree that an amputation increment can be awarded only to a worker whose disability is partial and permanent. We hold that an amputation award cannot be granted to a claimant whose injury or condition has rendered him permanently and totally disabled.
The salient facts can be stated briefly. On November 30, 1983, petitioner was working at Concord's factory when a plastic molding machine crushed his right forearm, ultimately resulting in the amputation of his wrist and hand. After the accident, petitioner was admitted to Rahway Hospital, where he remained for 13 days. Following his discharge, petitioner was referred to a psychiatrist for evaluation and treatment. He thereafter returned to the hospital for a skin graft. Subsequently, petitioner received outpatient therapy to improve movement at the elbow. He was initially fitted with a "hook type" prosthesis, but it ultimately caused too much pain to be useful.
*304 In late 1985, petitioner was given a full artificial arm. However, this device also caused pain and apparently served primarily a cosmetic purpose. At the time of the hearing, petitioner was unable to move the prosthesis without the support of his left arm. Petitioner's orthopedic expert testified that in addition to the 100% loss of the right hand, there was a 25% disability of the right arm due to the "flexion deformity" at the elbow.
Petitioner and his wife testified that he is no longer able to perform various personal and household tasks, including buttoning his clothing, bathing and shaving. Despite his attempts to seek employment, petitioner has been unable to obtain a job. This has resulted in severe depression. Petitioner testified, and his account was corroborated by his wife, that he suffers from recurrent bouts of insomnia, often has nightmares, and experiences "phantom pains" in his right arm. According to petitioner, he has a recurring "flashback" in which he observes his arm being crushed in the machine. This dominates his thoughts.
The record reflects that petitioner suffered two prior industrial injuries. Approximately 15 years ago, petitioner's left hand was fractured. Apparently, the fracture fully healed and it is uncontradicted that this injury had no lasting effect. A far more serious accident occurred in 1975. Petitioner injured three fingers of his right hand. This included a partial amputation of one finger. Following this accident, petitioner filed a claim and ultimately received an award of 27 1/2% of the right hand and eight percent of partial total for neuropsychiatric disability. Although petitioner testified that after the 1975 accident he occasionally suffered from headaches and dizziness, there was no evidence establishing continued psychiatric or medical treatment or any lasting impairment of his personal life or employment capability.
As we have noted, the 1975 injury was to the same hand that was amputated as a result of the 1983 accident. Petitioner's psychiatric expert testified that, based upon his examination of *305 May 22, 1985, petitioner suffered a neuropsychiatric disability of 50% for post-traumatic stress disorder with severe depression, requiring prolonged psychiatric treatment. He further testified that the 50% evaluation was wholly independent of the eight percent neuropsychiatric disability which followed the 1975 accident.
A vocational expert testified that petitioner was an unskilled laborer who was virtually unemployable after the amputation of the right forearm. This evaluation was based upon petitioner's age, language barrier, lack of education and employment skills, inability to adapt to the prosthesis and the severity of the injury and its psychiatric sequelae. In making this assessment, the witness heavily relied upon petitioner's personal background.
Because one of the issues before us is whether there is a basis in the record upon which the judge could reasonably have concluded, as he did, that petitioner was, by reason of the odd-lot doctrine, totally disabled, we recite this personal history in some detail. Petitioner, age 57, is married and the father of three children. Born in Puerto Rico, he attended school there through the second grade until he was orphaned and his formal education ceased. In 1959 or 1960, he moved to Perth Amboy and has resided there ever since except for a brief return to his homeland. Living and working in an almost exclusively Hispanic environment, petitioner has had little exposure to the English language. Although petitioner comprehends and can converse in English to a very limited extent, he can read and write only in Spanish. Because of his limited education, his arithmetic skills encompass only extremely simple problems.
While petitioner has an extensive employment history, his work skills even before the 1983 accident were very limited. While residing in Puerto Rico, petitioner was employed as a laborer cleaning coffee beans. In the United States, he worked, at varying times, as a dishwasher, material handler, welder, punch press machine operator and working foreman. It was as *306 a working foreman that petitioner operated the plastic molding machinery which caused the accident and the amputation of his hand and wrist.
Against this factual backdrop, the compensation judge found petitioner to be totally disabled under the odd-lot doctrine. In making that determination, the judge noted that "petitioner's medical injuries [emanating] from the accident exceed[ed] 75% of partial permanent." These included amputation of the hand, "100% for the loss of the remaining portion of the arm and shoulder as well as [the] disability for the scar at the donor site" caused by the skin graft and the psychiatric sequelae resulting from the accident. Alluding to petitioner's personal background and history, the judge determined that petitioner was permanently and totally disabled.
The judge rejected Concord's application to join the Second Injury Fund. In that respect, the judge determined that the 1983 accident "did not act in concert with the earlier functional loss so as to cause total disability." According to the judge, "[t]he last accident in and of itself caused petitioner to have significant disabilitation" which, coupled with his personal history, rendered him wholly unemployable.
The judge also determined that petitioner was entitled to an additional 30% award for amputation of his hand. In that regard, the judge awarded a lump sum amputation bonus computed at 30% of the permanent total rate. More specifically, the judge awarded an additional sum of $27,135, which consisted of 30% of permanent total benefits of 450 weeks at the rate of $201 per week.
This appeal followed. We will address the arguments advanced by Concord in seriatim.

I.
Initially, we find substantial support in the record for the judge's determination that petitioner was permanently and *307 totally disabled by reason of the odd-lot doctrine. We need not retread the ground so thoroughly explored by our Supreme Court in its decisions concerning this subject. See Lewicki v. N.J. Art Foundry, 88 N.J. 75, 81 (1981); Germain v. Cool-Rite Corp., 70 N.J. 1, 9 (1976); Barbato v. Alsan Masonry, 64 N.J. 514, 524-530 (1974); Oglesby v. American Dredging Co., 64 N.J. 538, 547-548 (1974); Zanchi v. S & K Const. Co., 63 N.J. 331, 332 (1973). Simply stated, the enlightened policy upon which the odd-lot doctrine rests "imposes upon the employer responsibility for a worker whose unemployability on a regular basis in a reasonably stable job market results not only from the direct medical consequences of a work-connected accident but also from the combination of those consequences, in themselves less than totally disabling, with the worker's personal handicaps." Crooms v. Central Steel Drum Co., 156 N.J. Super. 471, 473 (App.Div. 1978). Under the doctrine, the worker is viewed in the perspective of the competitive market place, Rodriguez v. Michael A. Scatuorchio, 42 N.J. Super. 341, 353 (App.Div. 1956), certif. den. 23 N.J. 140 (1957), where his inability to sell his labor may be traceable to his cultural background and personal history superimposed upon his physical disability. Barbato v. Alsan Masonry, supra, 64 N.J. at 528. See also Lightner v. Cohn, 76 N.J. Super. 461, 468 (App.Div. 1962), certif. den. 38 N.J. 611 (1962).
In our view, petitioner, by the clear weight of the evidence, presents a classic and poignant illustration of what the odd-lot doctrine contemplates. With a limited education and lack of non-manual work skills, petitioner found himself in an "odd-lot" of the labor market. The simple and overriding fact is that his physical disability in combination with his personal handicaps have rendered him virtually unemployable.
Of course, we recognize, as did the compensation judge, that the odd-lot doctrine may be applied only where the claimant's *308 physical and neuropsychiatric impairments constitute at least 75% of total disability. N.J.S.A. 34:15-36. Here, the compensation judge expressly determined that this statutory prerequisite was satisfied. Although the judge's findings could have been more specific, his factual determination that petitioner's physical injury and its psychiatric sequelae constituted at least 75% of total disability is supported by substantial credible evidence. See Bradley v. Henry Townsend Moving & Storage Co., 78 N.J. 532, 534 (1979); Close v. Kordulak Bros., 44 N.J. 589, 599 (1965); DeAngelo v. Alson Masons Inc., 122 N.J. Super. 88, 89-90 (App.Div. 1973), aff'd 62 N.J. 581 (1973). Indeed, a fair appraisal of the record admits of no other conclusion.
Our Supreme Court has said that total disability in the context of the odd-lot doctrine "is a combined law and fact question." Barbato v. Alsan Masonry, supra, 64 N.J. at 530. We are convinced that the judge's factual findings and legal conclusions are amply supported by the record and we perceive no sound basis to disturb his determination of permanent and total disability.

II.
We also conclude that the compensation judge correctly denied Concord's application to join the Second Injury Fund. Although the Attorney General apparently contends that the Fund can never be liable when a worker is deemed permanently and totally disabled by reason of the odd-lot doctrine, but see Lewicki v. N.J. Art Foundry, supra; Katz v. Township of Howell, 68 N.J. 125, 133 (1975) (Katz II); Crooms v. Central Steel Drum Co., supra, we have no occasion to address that question. Rather, we prefer to resolve the issue presented on the narrower proposition that the 1983 accident in itself, irrespective of any prior impairment, caused petitioner to be permanently and totally disabled. The judge so found and there is ample support in the record for this conclusion.
*309 Under N.J.S.A. 34:15-95, "the Fund is liable when a partially permanently disabled worker becomes totally and permanently disabled as a result of a work-connected accident ... that, in combination with the preexisting physical impairment, results in permanent total disability." Lewicki v. N.J. Art Foundry, supra, 88 N.J. at 83. In that event, the worker receives compensation for the full measure of his disability, but the employer is relieved of that portion of the burden unrelated to the employment. Ibid. See also Belth v. Anthony Ferrante & Son, Inc., 47 N.J. 38, 49 (1966). The aim of this statute is to encourage the hiring of people handicapped by preexisting disabilities. Paul v. Baltimore Upholstering Co., 66 N.J. 111, 129 (1974).
In order to invoke Fund liability, both the prior impairment and the later accident must have "in conjunction causally contributed to the total permanent disability." Lewicki v. N.J. Art Foundry, supra, 88 N.J. at 84. See also Katz v. Township of Howell, 67 N.J. 51, 65 (1975) (Katz I); Paul v. Baltimore Upholstery Co., supra, 66 N.J. at 126. An adverse form of this thesis is stated in N.J.S.A. 34:15-95(a), which exempts Fund liability "if the disability resulting from the injury caused by [the] last compensable accident in itself and irrespective of any previous condition or disability constitutes total and permanent disability within the meaning" of the act. See Katz v. Township of Howell, supra, 68 N.J. at 129. This section embodies the legislative policy that the employer at the time of the last accident should not enjoy a windfall of Fund relief "if the injury from that accident in itself is productive of a disability that qualifies as total and permanent ... by mere reason of the fact that prior conditions or disabilities may also be contributive to the actual ultimate condition of the work[er]." Id. at 132.
We are entirely satisfied from our reading of the record that the physical and neuropsychiatric impairments caused by the 1983 accident, in combination with the personal deficits to which we have alluded previously, rendered petitioner permanently *310 and totally disabled. It is quite clear that the contribution, if any, of petitioner's prior psychiatric impairment to his present overall disability is minor at best. We emphasize that although petitioner experienced some emotional distress following the 1975 accident, he neither sought nor obtained treatment for this condition. The record reflects that he was employed in the interval between the 1975 and 1983 accidents and that his lifestyle was not in any sense altered. Under these circumstances, we are fully convinced that the psychiatric sequelae which followed the 1975 injury can best be characterized as ephemeral and transient, at least within the perspective of our present vantage point of twenty-twenty hindsight. We are, thus, in complete accord with the judge's conclusion that the exemption set forth in N.J.S.A. 34:15-95(a) was applicable and, therefore, there was no reasonable basis to support Fund liability.

III.
We next turn to Concord's assertion that the compensation judge erroneously awarded an amputation increment. Although stated in a variety of ways, the principal thrust of Concord's contention is that a 30% amputation increment can be granted only to a worker whose disability is partial and permanent. We find this argument persuasive.
A brief description of the applicable statutory provisions is necessary for a full understanding of the issues presented. N.J.S.A. 34:15-12 sets forth the schedule of payments to be made to workers as compensation for work-related injuries. N.J.S.A. 34:15-12(b) provides a compensation rate and method of payment for "disability total in character and permanent in quality." The latter phrase, "disability total in character and permanent in quality," is defined in N.J.S.A. 34:15-36 as "a physical or neuropsychiatric total permanent impairment caused by a compensable accident or compensable occupational *311 disease where no fundamental or marked improvement in such condition can be reasonably expected." Subject to certain qualifications not relevant to our present discussion, N.J.S.A. 34:15-12(b) provides that a worker who has been rendered permanently and totally disabled is entitled to receive compensation consisting of 70% of the weekly wages earned at the time of the injury "for a period of 450 weeks...." At the conclusion of that period, benefits are to cease unless the employee has submitted to a rehabilitation program and can show that because of his disability it is impossible for him to obtain wages equal to those earned at the time of the accident. Ibid. In the latter event, compensation benefits, subject to certain limitations, are to continue indefinitely. Ibid.
N.J.S.A. 34:15-12(c) sets forth a schedule of payments to workers who suffer permanent partial disabilities. Specifically, that section provides a comprehensive weekly compensation schedule for "disability partial in character and permanent in quality." The latter phrase is defined in N.J.S.A. 34:15-36 as follows:
`Disability permanent in quality and partial in character' means a permanent impairment caused by a compensable accident or compensable occupational disease, based upon demonstrable objective medical evidence, which restricts the function of the body or its members or organs; included in the criteria which shall be considered shall be whether there has been a lessening to a material degree of an employee's working ability. Subject to the above provisions nothing in this definition shall be construed to preclude benefits to a worker who returns to work following a compensable accident even if there be no reduction in earnings. Injuries such as minor lacerations, minor contusions, minor sprains, and scars which do not constitute significant permanent disfigurement, and occupational disease of a minor nature such as mild dermatitis and mild bronchitis shall not constitute permanent disability within the meaning of this definition.
N.J.S.A. 34:15-12(c)(1) to (11) set forth the basic schedule of payments for loss of anatomically distinct parts of the body. N.J.S.A. 34:15-12(c)(12) through (23) generally instruct on the amount of compensation that is to be awarded to a worker where the injury does not neatly fit into one of the categories *312 specified in paragraphs (1) through (11). Under the schedule, compensation benefits are calculated by translating the worker's loss into a stated number of weeks and paying him a weekly sum of money over this period. See Poswiatowski v. Standard Chlorine Chemical Co., 96 N.J. 321, 323 (1984). For example, the loss of a hand is equated with 245 weeks, a leg 315 weeks, and a foot 230 weeks. N.J.S.A. 34:15-12(c). Partial losses are expressed in percentages. Thus, the loss of the first phalange of a finger is considered the loss of one-half of the finger. N.J.S.A. 34:15-12(c)(12). The loss of an unscheduled bodily function is equated with a percentage of total disability, which, in turn, is defined in terms of 600 weeks. N.J.S.A. 34:15-12(c)(22).
We are concerned here with N.J.S.A. 34:15-12(c)(21), which provides:
Amputation between the elbow and the wrist shall be considered as the equivalent of the loss of a hand and amputation at the elbow shall be considered equivalent to the loss of the arm.... An additional amount of 30% of the amputation award shall be added to that award to compute the total award made in amputations of body members, provided, however, that this additional amount shall not be subject to legal fees. [Emphasis added].
In our view, this paragraph authorizes the award of an amputation increment only to workers whose injuries are permanent and partial.
We arrive at this conclusion for two reasons. First, given the structure of the statutory scheme and the division of subjects in N.J.S.A. 34:15-12(b) and 12(c), we perceive a legislative design to draw a sharp distinction between permanent and total disability and permanent and partial disability. A plain reading of N.J.S.A. 34:15-12(c) mandates that no amputation increment was contemplated when total disability is found. By its very terms, N.J.S.A. 34:15-12(c) applies only to "disability partial in character and permanent in quality." The location of the sentence italicized above is strongly suggestive of a legislative design to permit the award of an amputation increment only to *313 those workers whose injuries or condition result in partial disability. Cf. Trinter v. Esna Division, 186 N.J. Super. 316, 320 (App.Div. 1982).
Second, our review of the legislative history strongly militates in favor of this construction of the statutory scheme. The 30% amputation increment was added by the 1980 amendments to the Workers' Compensation Act. Id. at 319. However, we have traced its origin to a proposal contained in a report prepared by the New Jersey Workmen's Compensation Law Study Commission in 1968. Report of the Workmen's Compensation Law Study Commission, at 9 (July 1968). In its report, the Commission recommended that "amputation of any major member [of the body] ... be compensated by allowing an additional 25% of the benefits provided in the schedule for the particular member." Ibid. The Commission also recommended that the loss of two major members by amputation or enucleation should automatically result in a finding of total disability, but in that event "no compensation [should] be paid beyond that amount paid for total disability." Ibid. See also Appendix To Workmen's Compensation Law Study Commission Report, at 8 (July 1968). Although the Commission did not specifically recommend that an amputation increment should not be awarded to a worker who becomes totally disabled by reason of a work-connected injury, the clear import of its recommendation is strongly suggestive of that interpretation.
Of course, we are not unmindful of the opinion rendered by our colleagues in Kitt v. Foster Canning Co., Inc., 198 N.J. Super. 388 (App.Div. 1985), certif. den. 101 N.J. 245 (1985), holding that an amputation increment may be awarded to a worker categorized as totally disabled by virtue of the amputation of two major members. Id. at 389-390. We merely add that the court there was concerned with a different section of the statute, N.J.S.A. 34:15-12(c)(20), and we thus have no occasion to offer our opinion concerning the viability of that holding. To *314 the extent that Kitt derogates from the conclusion we have reached here, we note our disagreement for the reasons stated previously.
We also acknowledge that one of the principal purposes in enacting the amendments of 1980 was to increase the award of benefits to seriously injured workers. See Poswiatowski v. Standard Chlorine Chemical Co., supra, 96 N.J. at 329; Trinter v. Esna Division, supra, 186 N.J. Super. at 320; Joint Legislative Statement Accompanying Amendments to the Workers' Compensation Act. However, we discern nothing in the legislative history to support the award of benefits to a totally disabled worker beyond those provided by N.J.S.A. 34:15-12(b).[1] We emphasize that such a worker may, and often does, receive compensation benefits for the remainder of his life. In short, our interpretation of the statute is not inconsistent with the laudatory goal of rendering aid to those left helpless by reason of a work-connected injury or condition.

IV.
We thus hold that the compensation judge was without the authority to award an amputation increment. That portion of the Division's determination is vacated. So modified, the determination is affirmed.
NOTES
[1] N.J.S.A. 34:15-12(b), which deals with total disability, has no statutory counterpart to N.J.S.A. 34:15-12(c)(21), the section which mandates the award of an amputation increment to a partially disabled worker. This omission can lead to inequities. For example, under N.J.S.A. 34:15-12(c), a worker, who has been rendered partially disabled by reason of an amputation, receives a substantially greater award than a partially disabled worker whose impairment arises from some other source, although the two have the exact same percentage of permanent disability. On the other hand, a worker who has been rendered totally disabled by reason of an amputation receives no greater benefit, under N.J.S.A. 34:15-12(b), than a worker whose total disability is the result of some other type of injury. However, this apparent incongruity is required by a fair reading of the statute and can best be remedied by legislative amendment. Our role is merely to apply the statute as written.